**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**ABERDEEN DIVISION**

| | | |
|---|---|---|
| TRONOX LIMITED, | ) | |
| | ) | |
| Plaintiff, | ) | **Civil Action No.** <u>1:18cv10-SA-RP</u> |
| | ) | |
| v. | ) | **EMERGENCY COMPLAINT FOR** |
| | ) | **DECLARATORY JUDGMENT** |
| FEDERAL TRADE COMMISSION, | ) | **AND INJUNCTIVE RELIEF** |
| | ) | |
| Defendant. | ) | |

Plaintiff Tronox Limited ("Tronox") for its complaint against the Federal Trade Commission ("FTC") hereby alleges as follows:

**NATURE OF THE ACTION**

1. This is a case about basic fairness in antitrust regulation. A company based in the United States is trying to acquire a Saudi company so the combined entity can increase the output of titanium dioxide ("TiO2") available to customers around the world. There is no legitimate case for blocking the transaction under the antitrust laws because an output-enhancing combination like this proposed acquisition will necessarily benefit consumers. The FTC is trying to block the transaction, not through ordinary litigation processes in the federal courts but instead by challenging the transaction only using its time-consuming administrative process, thus running out the clock until the purchase agreement expires, so the parties never have a meaningful opportunity to defend the legality of Tronox's proposed acquisition. As detailed below, this complaint raises a simple request: Tronox is asking for its day in Court, so the FTC cannot block this transaction without having to address its pro-competitive merits in a federal court.

2.     Tronox, a mining and chemical company with global operations, has agreed to acquire the Ti02 business of the National Titanium Dioxide Company Limited of the Kingdom of Saudi Arabia ("Cristal").  The purpose of this $2.4 billion acquisition is to increase titanium-dioxide production so the combined company can better compete with global market leaders and lower-cost Chinese producers of titanium dioxide who are increasing their presence in the global market, including in the United States.  For more than ten months, Tronox and Cristal have complied with the regulatory demands of the FTC, producing millions of pages of documents, making executives available for sworn testimony, and answering all of the questions raised by the FTC's staff.  Nevertheless, the two members of the Commission who are currently serving (of the five who are supposed to be serving) voted to oppose the transaction and authorized the FTC's staff to file a lawsuit to enjoin it.

3.     Instead of filing a lawsuit in federal court to enjoin the transaction as it has routinely done in the past, the FTC is engaged in a cynical strategy of delay.  The FTC has known from the start that Tronox's purchase agreement with Cristal expires May 21, 2018.  The FTC also knows that it would need to file its federal-court request for an injunction as soon as possible for the parties to have sufficient time to litigate the merits of the proposed transaction.  But the FTC refuses to file its federal-court complaint and is instead proceeding solely with administrative proceedings that could not possibly conclude in time for Tronox and Cristal to close their acquisition before May 21, 2018.  As even the administrative law judge presiding over that case has observed, "everybody involved in these proceedings knows that there's no way to get this through the [FTC administrative] system before the merger would be … consummated. …  It's never going to happen."  Dec. 20, 2017 Pretrial Conf. Tr. 77-78.  In other

words, the FTC's approach would run out the clock instead of resolving the legality of the Tronox-Cristal transaction on the merits.

4.      Tronox is asking this Court to prevent the FTC from blocking the proposed transaction through inaction and delay.  The FTC's decision not to seek a preliminary injunction in federal court effectively deprives Tronox of any opportunity to resolve the FTC's objections to its acquisition of Cristal before its purchase agreement expires on May 21, 2018.  The FTC's approach contradicts years of well-settled practice, as recognized by the courts, practitioners, scholars, FTC Commissioners, and even the FTC's own policy statements.  It is contrary to the FTC Chairman's public position that the FTC should not be able to use the administrative process in the context of unconsummated mergers, but should be limited to seeking an injunction in federal court.  Under the circumstances, it is clear that the FTC is taking this approach to avoid having to support its objections to the transaction with evidence or economic analysis.  Because the pro-competitive case for the Tronox-Cristal acquisition is overwhelming, the FTC plans to run out the clock until the deal expires rather than litigating the merits of its objections.

5.      Tronox's request is straightforward: all it seeks is a meaningful day in court.  The FTC should not be allowed to prevent the proposed transaction by unreasonably withholding action.  It should have to bring its federal-court complaint in time to litigate the merits of the case—consistent with the FTC's own ordinary practice—or it should be enjoined from trying to block the acquisition.  In the alternative, this Court should give Tronox its day in court, conduct the trial that ordinarily occurs, and declare that the FTC has no right under Section 13(b) of the FTC Act to enjoin the transaction.

6.      While this case is fundamentally about fairness and the misuse of the administrative process, the underlying transaction has important implications for consumers and

the entire economy. As detailed in this complaint, the proposed transaction will generate significant benefits for consumers, businesses, and workers throughout the United States, and particularly in Mississippi, where Tronox has its largest operations. Tronox is prepared to demonstrate that its acquisition of Cristal is pro-consumer, pro-competition, and pro-growth. Allowing the FTC to block this transaction would create serious economic harm to Tronox and Cristal, and to the titanium-dioxide market as a whole.

## THE PARTIES, JURISDICTION, AND VENUE

7.      Plaintiff Tronox is a publicly-traded company with its principal corporate offices in Stamford, Connecticut and an operations and research center in Oklahoma City, Oklahoma. Tronox was part of the Kerr-McGee Chemical Corporation before it spun off from its parent in 2005. Tronox filed for Chapter 11 bankruptcy in January 2009, and it successfully emerged from Chapter 11 as a restructured company in February 2011. In 2012, Tronox acquired the mineral sands operations of Exxaro Resources Limited (a South African-based mining company) that produces the main feedstock for Tronox's TiO2 pigment production facilities, and incorporated the combined entity as a holding corporation under the laws of Australia. As a result of the acquisition, Tronox became a leading vertically-integrated producer of TiO2.

8.      Tronox has global TiO2 mining and manufacturing operations. Its largest TiO2 production facility, which it has owned and operated since the 1960s, is located in Hamilton, Mississippi. The Hamilton facility alone manufactures almost half of Tronox's worldwide TiO2 production. It employs approximately 420 workers, with tens of millions of dollars in total payroll. Tronox also has production facilities in Botlek, the Netherlands, and Kwinana, Australia. It owns and operates mines and processing plants in South Africa and Australia to provide feedstock for its TiO2 manufacturing business. In 2016, Tronox's TiO2 business

generated sales of approximately $1.3 billion globally, with approximately 46% of its product sold in North America.

9. Cristal, headquartered in Jeddah, Saudi Arabia, is a privately held company. It is owned 79% by The National Industrialization Company ("TASNEE"), a Saudi joint-stock company, 20% by Gulf Investment Corporation, and 1% by a private investor. Cristal mines titanium ore and other minerals and manufactures and sells TiO2 pigment. In 2016, Cristal's TiO2 sales were $1.7 billion globally. Cristal produces TiO2 in Ashtabula, Ohio, and in the United Kingdom, Australia, Saudi Arabia, Brazil, China, and France. Cristal also owns and operates titanium feedstock facilities in Australia, Brazil and Saudi Arabia. Cristal is a named party to the acquisition agreement with Tronox.

10. The FTC is a federal administrative agency established by the Federal Trade Commission Act ("FTC Act"), codified at 15 U.S.C. §§ 41-58. The FTC Act authorizes the FTC to, among other things, prevent unfair methods of competition, seek monetary redress and other relief for conduct injurious to consumers, and conduct investigations relating to the organization of businesses engaged in commerce.

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 2201, 2202, 1331, and 1337(a). Pursuant to 28 U.S.C. § 2201(a), "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Declaratory judgments granted by courts under 28 U.S.C. § 2201 carry "the force and effect of a final judgment."

12. Tronox and Cristal's subsidiaries that do business in the United States are, and at all relevant times have been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12, and

5

are therefore subject to enforcement actions by the FTC. Section 13(b) of the FTC Act (codified at 15 U.S.C. § 53 (b)) gives the FTC authority to seek a preliminary injunction to prevent Tronox and Cristal's transaction from closing pending the Part 3 Proceeding. This statutory right is a federal law and the resolution of the issue of whether a court should grant such an injunction is a federal question. *See* 28 U.S.C. § 1331.

13. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(e) because the FTC is present in and enforces the FTC Act in this district, and the FTC's acts and omissions harm Tronox's business and operations in this district, including Tronox's production facility that is located in Hamilton, Mississippi.

## THE TIO2 MARKET AND TRONOX'S ACQUISITION OF CRISTAL

14. TiO2 is an inorganic white pigment used to whiten a variety of products and found in an array of end-uses, including coatings and plastics, which account for more than 80% of global consumption. The market for TiO2 operates globally, with mining and production facilities around the world supplying purchasers who are also located around the world. By way of illustration, in 2015 the United States exported 55% of its domestic production and imported 29% of its domestic consumption of TiO2.

15. This global market for TiO2 is highly competitive. Tronox emerged from bankruptcy in 2011 and found itself competing in an industry with significant challenges for producers, including sustained periods of falling prices, negative profit margins, and increased competition from Chinese suppliers.

16. Tronox's strategy for addressing the challenges in the TiO2 market includes the $2.4 billion acquisition of Cristal, a global producer of TiO2 based in Saudi Arabia. The combination of the Tronox and Cristal TiO2 businesses would create a highly integrated TiO2 producer, thus allowing significant cost improvements through efficiencies at all levels of the

organization. The combined company would operate 11 TiO2 pigment plans in eight countries with a total capacity of 1.3 million metric tons per annum and would have titanium feedstock operations in three countries with a total capacity of 1.5 million metric tons per annum.

17. The production of TiO2 involves very high fixed costs, and Tronox's acquisition of Cristal would allow the combined company to improve its operating margins by increasing its global production of TiO2 and thus benefiting from cost dilution. The result would be a more efficient, more vertically-integrated TiO2 producer, prepared to compete with global market leaders by producing more high-quality TiO2 with lower costs. By definition, this acquisition would enhance competition and benefit consumers because the entire premise of the transaction is that Tronox would increase its production and therefore increase the global supply of TiO2.

## STATUTORY AND REGULATORY BACKGROUND

18. Section 7 of the Clayton Antitrust Act ("Section 7"), codified at 15 U.S.C. § 18, prohibits mergers and acquisitions where the "effect … may be substantially to lessen competition" "or to tend to create a monopoly." Both the FTC and the Department of Justice have authority to file suit to block a proposed merger or acquisition that potentially violates Section 7. The Department of Justice's authority to file such an action is granted by Section 15 of the Clayton Act, 15 U.S.C. § 13, while the FTC's authority to file suit is granted by Section 13(b) of the FTC Act.

19. Parties seeking to engage in certain corporate transactions must comply with the comprehensive notice and review requirements of the Hart-Scott-Rodino Act ("HSR Act"), codified at 15 U.S.C. § 18a. The HSR Act first requires parties to report the proposed transaction and file a detailed notice relating to the proposed transaction. The HSR filing must be sent to both the Department of Justice and the FTC. Although the two agencies have concurrent, overlapping authority to review almost all transactions that must be reported under

7

the HSR Act, in practice only one agency takes responsibility for investigating a particular transaction.

20.    After the parties give notice through their filings under the HSR Act, the statute provides that agencies have 30 days to review the proposed transaction.  If the reviewing agency decides at any point during the 30-day review period that the transaction raises no significant issues under Section 7, then the deal may proceed.

21.    If the reviewing agency continues to have concerns about the proposed transaction, then the agency may issue a "Request for Additional Information and Documentary Material," commonly referred to as a "Second Request."  At that point, the parties must comply with the agency's request for more detailed documents and information about the proposed transaction, or reach some other accommodation with the reviewing agency, before the transaction can close.  Complying with a Second Request is a detailed, costly, and burdensome process that often takes more than six months and millions of dollars to complete.  Many parties choose to abandon their proposed transaction rather than face the onerous process of complying with a Second Request or facing an agency challenge.

22.    Once both parties to a proposed transaction have substantially complied with the requirements of the Second Request, the HSR Act establishes an additional 30-day waiting period before the parties may proceed with the merger or acquisition.  In some instances, the agencies will seek the consent of the parties effectively to extend the second waiting period deadline.

23.    If the agency continues to believe at the end of the review period that a transaction violates Section 7 of the Clayton Act, it may file an action in federal district court to prevent the transaction from proceeding.

24.     The Department of Justice's only means of preventing a transaction from moving forward is to file for an injunction in federal district court pursuant to Section 15 of the Clayton Act.  When the Department of Justice files for an injunction, it seeks both a preliminary injunction and a permanent injunction from the court.  If the court does not grant an injunction, the proposed transaction moves forward.  If the court grants that injunction, then the deal may not proceed.

25.     On paper, the FTC's process is technically different from the Department of Justice's process, but as a practical matter it yields the same result.  If the FTC believes at the end of the Second Request waiting period that the proposed transaction will violate Section 7 of the Clayton Act, it initiates an adjudicatory proceeding before an administrative law judge.  Because this proceeding is governed by Part 3 of the FTC's Rules, the adjudicatory proceeding is typically referred to as a "Part 3 Proceeding."

26.     The initiation of a Part 3 Proceeding, however, does not itself prevent the transaction from moving forward.  In order to prevent consummation of the proposed merger or acquisition, the FTC must enjoin the transaction in federal district court.  The FTC is authorized to seek such injunctive relief pursuant to Section 13(b) of the FTC Act, which states in part:

> Whenever the Commission has reason to believe that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the federal trade Commission, and that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the commission has become final would be in the interest of the public.

*See* 15 U.S.C. §53(b).  Thus, the FTC may file for a preliminary injunction in federal district court when it initiates a Part 3 Proceeding.

27.     If the FTC does not seek a preliminary injunction in federal district court, the parties may move forward with the proposed transaction, even if a Part 3 Proceeding is ongoing.

Hence, not surprisingly, the FTC's official Policy Statement states that it is "the Commission's usual practice" when prosecuting a Part 3 Proceeding "to seek a preliminary injunction in federal district court to prevent the consummation of the proposed transaction." *See* Fed. Reg. Vol. 60, No. 149 at pg. 39742, Aug. 3, 1995. At the hearing to open Part 3 Proceedings in this very case, the FTC's administrative law judge stated *his* expectation that the matter would be resolved in a preliminary injunction proceeding in federal court: "I would like to know that there's an ancillary federal proceeding working its way through the snake so that we're not dangling forever waiting on something." Dec. 20, 2017 Pretrial Conf. Tr. 13.

28.     The FTC has historically and consistently adhered to this process of litigating transactions by filing in federal court for a preliminary injunction, in part, because it makes FTC enforcement comparable to that of the Department of Justice, which also investigates mergers and acquisitions and enforces antitrust law. The Department has access only to the federal courts as its forum for litigating transactions, as it lacks an additional internal administrative court for review. The FTC's practice of seeking a preliminary injunction in federal court means that outcomes are not affected or determined by which agency selects them for review. Indeed, the current FTC Chairman, Maureen Ohlhausen, has publicly endorsed a proposed legislative reform that would bar the FTC entirely from challenging unconsummated mergers in Part 3 Proceedings, leaving the FTC *only* the option to file for an injunction in federal court, as the Department of Justice must do. Maureen Ohlhausen, Chairman, Federal Trade Commission, *The FTC's Path Ahead*, GCR Live 6th Annual Antitrust Law Leaders Forum, at p.10, Feb. 3, 2017. Joshua Wright, a former Commissioner, has endorsed the same proposed reform: "[I]n addition to equalizing the preliminary injunction standards between the FTC and DOJ …[,] sending both agencies to federal court to challenge unconsummated mergers also makes sense." Joshua

Wright, former Commissioner, Federal Trade Commission, *Judging Antitrust*, Global Antitrust Institute Invitational Moot Court Competition, at p.4, Feb. 21, 2015.

29.     While the FTC and the parties litigate the preliminary injunction in federal court, the Part 3 Proceeding typically is stayed, and the court's decision on whether to grant the FTC's request for a preliminary injunction usually determines whether the transaction will proceed.  As the administrative law judge presiding over the Part 3 Proceedings in this case observed, the FTC and the transacting parties ordinarily "work out an agreement to say we're not going to do anything [in Part 3 Proceedings] until we hear from the federal judge on this injunction proceeding."  Dec. 20, 2017 Pretrial Conf. Tr. 13.

30.     If the federal court grants the preliminary injunction, the parties may not complete the transaction.  The Part 3 Proceedings technically could continue, but the parties invariably choose not to continue the adjudicatory process if they do not prevail in federal court, because the Part 3 Proceedings simply take too long to be commercially practicable.  In nearly all cases, the parties simply abandon the proposed transaction.

31.     If the federal court denies the FTC's request for a preliminary injunction, the parties may move forward with their proposed transaction.  The FTC has the option of continuing forward in its Part 3 Proceedings, and the FTC technically may seek a broad array of remedies, including disgorgement or divestiture, even after a transaction has closed.  In practice, however, the legality of a proposed transaction is determined during the Section 13(b) proceedings in federal district court, which the court typically decides in four to five months from the FTC's filing of the complaint through the decision of the district court.  Indeed, it has been more than twenty years since the FTC chose to continue litigating a merger challenge in Part 3 Proceedings after a federal court denied the FTC's request for a preliminary injunction.

32.     To successfully obtain a preliminary injunction, the FTC would need to "demonstrate (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction does not issue; (3) that the threatened injury outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction is in the public interest." *Moore v. Brown*, 868 F.3d 398, 402-03 (5th Cir. 2017). To establish a likelihood of success on the merits, the government must show that "there is a reasonable probability that the challenged transaction will substantially impair competition." *FTC v. Staples*, 970 F. Supp. 1066, 1072 (D.D.C. 1997) ("*Staples I*") (quoting *FTC v. Univ. Health*, 938 F.2d 1206, 1218 (11th Cir. 1991). Under well-settled precedent, the FTC must present "rigorous proof" to block a proposed transaction, as the "issuance of a preliminary injunction blocking an acquisition or merger" is "an extraordinary remedy" and likely will "prevent the transaction from ever being consummated." *FTC v. Staples*, 190 F. Supp. 3d 100, 115 (D.D.C. 2016) ("*Staples II*") (quoting *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980).

### THE FTC'S REVIEW OF THE PROPOSED TRANSACTION

33.     Tronox and Cristal have complied with every requirement of the administrative review process in seeking clearance for their proposed acquisition. The parties executed their purchase agreement on February 21, 2017. Shortly after the proposed acquisition was announced, the parties contacted the FTC in advance of making their HSR filings. In the weeks that followed, the parties voluntarily provided information to the FTC and met with the FTC on March 2, 2017 to discuss the proposed transaction. The parties completed their HSR filings on March 14, 2017. By that date, the FTC knew that the purchase agreement would expire on May 21, 2018.

34.     The FTC issued its Second Requests to Tronox and Cristal on April 13, 2017. The Second Request called for detailed information about the parties' strategic plans, the

products sold by Tronox and Cristal, information about customers and pricing, information about profitability and margins, and information about the market for TiO2.  Tronox and Cristal timely submitted responsive documents, narrative responses, and data to the FTC, and they substantially completed their response to the Second Request by September 7, 2017 (for Tronox) and September 20, 2017 (for Cristal).  In addition, Tronox and Cristal answered numerous additional questions presented by the FTC about the proposed transaction and submitted several comprehensive analyses to the FTC about the proposed transaction and its pro-competitive benefits.

35.    Tronox and Cristal also agreed to extend the time for the FTC to consider their responses to the Second Request.  Through a series of letter agreements, the parties gave the FTC more than six weeks of additional time beyond that which is allotted under the HSR Act to determine whether it should initiate proceedings to prevent the acquisition.  Throughout the time it was requesting and receiving extensions, the FTC was well aware of the May 21, 2018 expiration date.  Eventually, the parties agreed that they would not close the transaction before December 1, 2017 so that the FTC would have yet more time to review the parties' submissions and resolve whether to challenge the transaction.

36.    On December 5, 2017, the FTC filed an administrative complaint pursuant to the Part 3 rules.  The administrative complaint scheduled the start of the Part 3 trial for May 8, 2018. Under the schedule set by the FTC, it will be impossible for the parties to litigate the FTC's objections to the proposed transaction before the May 21, 2018 deadline.  The Part 3 Proceedings will require several weeks for the presentation of evidence, several weeks for a decision from the administrative law judge, and an unspecified period of time for either side to seek *de novo*

review from the FTC. The administrative proceedings will not be completed until late 2018 at the earliest, months after the purchase agreement expires.

37.     At the same time the FTC acted to initiate the administrative proceedings, it also publicly announced that it had authorized agency staff to seek a preliminary injunction in federal court to block the transaction. Yet the FTC refused to seek a preliminary injunction in federal court, despite knowing that its scheduled administrative proceedings could not be resolved before the parties' closing deadline. The FTC did not seek a preliminary injunction on December 5, 2017 when it filed its administrative complaint. On December 8, 2017, counsel for the FTC confirmed that the FTC had no intention of seeking a preliminary injunction, even though it had been the FTC's ordinary practice to file a federal-court lawsuit with its administrative complaint. On December 11, 2017, counsel for the FTC confirmed that the decision not to file a federal-court complaint was directed by Bruce Hoffman, the Director of the Bureau of Competition. In response to the concern that the parties would not have sufficient time to litigate the FTC's objections to the proposed transaction before May 21, 2018 without a federal-court case, the FTC's counsel suggested that the parties re-negotiate the expiration date of their purchase agreement to accommodate the FTC.

38.     Counsel for the FTC claimed that the FTC would not seek a preliminary injunction because the European Commission is still reviewing the proposed transaction, even though counsel for the FTC simultaneously admitted that what the European Commission does is not relevant to its own enforcement decision. Dec. 20, 2017 Pretrial Conf. Tr. 6 ("JUDGE: And you think what Europe does is relevant to us? [FTC COUNSEL]: No, Your Honor."). This position ignores that the FTC routinely seeks preliminary injunctions to prevent transactions even when European regulatory approvals were pending. The position also ignores the practical

problem with refusing to seek a preliminary injunction in this case. The European Commission is likely to conclude its regulatory proceedings by mid-May 2018, and it is possible the European Commission will conclude those proceedings at any time before then. If the European Commission approves the acquisition, Tronox and Cristal would be free to close their deal before the deadline. If the FTC waits for clearance from the European Commission to bring its federal-court lawsuit, however, then there will be no opportunity for meaningful litigation over the legality of the proposed transaction before the purchase agreement expires on May 21, 2018.

39.     It bears emphasis that Tronox has no assurance that the FTC will seek its preliminary injunction in a timely manner. In fact, counsel for the FTC has not committed to bringing any preliminary-injunction request at all, even though the Commission has authorized it. At this point, regardless of whether Tronox and Cristal secure all of the necessary approvals in other jurisdictions, Tronox will have had no chance to defend its acquisition of Cristal in court before the May 21, 2018 expiration of the deal.

40.     On December 20, 2017, the administrative law judge held an initial scheduling conference to begin the Part 3 Proceedings. At the hearing, the administrative law judge repeatedly expressed his view that the Part 3 Proceedings in this case would be a waste of "tax money, anybody's tax money, or a client's money" because the proceedings could not resolve the legality of the proposed transaction before the deal expired. Dec. 20, 2017 Pretrial Conf. Tr. 9-10. The administrative law judge pressed counsel for the FTC about why the FTC was not following the ordinary practices in this case. Indeed, the FTC's own administrative law judge noted that a preliminary-injunction lawsuit would provide the most efficient way of resolving the FTC's objections to the transaction. *Id*. at 19. The FTC had no good answer to the administrative law judge's questions.

15

41.     The FTC's own official Policy Statement acknowledges that "the Commission's usual practice" is "to seek a preliminary injunction in federal district court" under Section 13(b) in tandem with the filing of its administrative Part 3 adjudicatory complaint.  *See* Fed. Reg. Vol. 60, No. 149 at pg. 39742, Aug. 3, 1995.  The courts, Congress, scholars, and practitioners universally recognize this procedure as the FTC's ordinary practice.  Indeed, then-Chairman of the FTC, Edith Ramirez, testified before the Senate Judiciary Committee that the FTC's transaction challenge process is "typically . . . a two-step process, whereby we first go into federal court and then proceed administratively."  *S. 2102 , The 'Standard Merger and Acquisition Reviews Through Equal Rules Act of 2015' Before the Subcomm.* on *Antitrust, Competition Policy and Consumer Rights of the S. Comm. on the Judiciary*, 115th Cong. (2015), at 55:33, *available at* https://www.judiciary.senate.gov/meetings/s-2102_the-standard-merger-and-acquisition-reviews-through-equal-rules-act-of-2015.  As a practical matter, the preliminary-injunction case provides the only vehicle for resolving the FTC's objections to a merger or acquisition in a meaningful way—with the opportunity for necessary discovery, compulsory process of witnesses, the presentation of expert analysis, and a hearing before a judicial officer.

42.     If the FTC had followed its ordinary practice in this case and filed for a preliminary injunction when it initiated its Part 3 Proceeding, a federal district court would have sufficient time to resolve whether to enjoin the transaction under Section 13(b) before May 21, 2018.  Because the FTC has not yet sought a preliminary injunction, every passing day makes it less likely that the parties will have any meaningful opportunity to litigate the legality of the FTC's objections before the purchase agreement expires.  Every passing day creates additional time pressure on the already-expedited fact discovery, expert discovery, and trial preparation necessary to litigate an antitrust acquisition case.  The passage of time also creates additional

pressure on the federal court's consideration of the FTC's objections and the time for the federal judge to issue a decision. At a certain point in the near future, it will be practically impossible for the parties to litigate the preliminary-injunction case before May 21, 2018.

43.     The FTC's failure to follow its ordinary practice in this case is also at odds with the Commissioners' publicly-stated commitment to transparency and parity in the regulatory review process. The current Chairman of the FTC Maureen Ohlhausen has acknowledged time and again that "transparency and predictability are crucial to maintaining support for the FTC's mission," and she has highlighted FTC merger practices, like the issuance of public statements when the agency closes a merger or acquisition investigation, as being laudably transparent. Maureen K. Ohlhausen, *100 Is the New 30: Recommendations for the FTC's Next 100 Years*, 21 Geo. Mason L. Rev., 1131, 1139-40 (2014). Chairman Ohlhausen has also expressed a commitment to parity with the Department of Justice's antitrust enforcement with that of the FTC's, stating, "[a] merging company's prospects should not depend on which agency reviews its HSR filing." Maureen K. Ohlhausen, Chairman, Fed. Trade Comm'n, The FTC's Path Ahead, Glob. Comp. Rev. 6th Annual Antitrust Law Leaders Forum, at 10 (Feb. 3, 2017), *available at* https://www.ftc.gov/system/files/documents/public_statements/1070123/gcr_the-ftc_path_ahead.pdf. Likewise, then-Chairman Edith Ramirez stated, with respect to the FTC's merger and acquisition challenge and review procedures, "the process does not have an impact on outcomes and . . . it is ultimately comparable to what transpires when the Department of Justice is looking at transactions." *S. 2102, The 'Standard Merger and Acquisition Reviews Through Equal Rules Act of 2015' Before the Subcomm. on Antitrust, Competition Policy and Consumer Rights of the S. Comm. on the Judiciary*, 115th Cong. (2015), at 48:54, *available at* https://www.judiciary.senate.gov/meetings/s-2102_the-standard-merger-and-acquisition-

reviews-through-equal-rules-act-of-2015. Yet in this case, the FTC's actions have been unpredictable and arbitrary, subjecting the transacting parties to a process significantly more onerous and time-consuming than they otherwise would have faced if the Department of Justice had reviewed the transaction and indeed, a process that will irreparably doom the proposed acquisition in the absence of relief by this Court. The FTC has provided no satisfactory explanation for deviating from its past practices in this case by filing a Part 3 Proceeding without an accompanying preliminary injunction suit in federal court. It is simply choosing to run out the clock on this transaction rather than having to support its objections in open court where Tronox and Cristal could challenge the FTC's evidence and economic analysis and provide rebuttals and strong counter-evidence supporting the acquisition.

44.    Tronox is substantially injured by the FTC's failure to file timely for a preliminary injunction in federal court that could resolve the legality of the proposed acquisition before the deadline for Tronox and Cristal to close the deal. Most fundamentally, the FTC's delay is poised entirely to deny Tronox its day in court to defend its lawful transaction. At best, the FTC proposes to run to federal court mere days before the transaction is set to close, at which point it will be too late for Tronox to obtain meaningful relief and due process before the scheduled deadline.

45.    The proposed transaction between Tronox and Cristal is pro-competitive and does not substantially lessen competition in any relevant market under Section 7 of the Clayton Act. Thus, when the FTC ultimately files for a preliminary injunction, it will not be able to establish a likelihood of success on the merits as required under Section 13(b) of the FTC Act.

**THE FLAWS IN THE FTC'S OBJECTIONS TO THE PROPOSED TRANSACTION**

46.    The objections to the proposed acquisition set forth in the FTC's administrative complaint are fundamentally flawed and legally unsustainable. The FTC's market definition is

wrong both as a matter of relevant geographic market and as a matter of relevant product market. Moreover, the FTC cannot articulate a theory as to how this output-enhancing transaction will harm competition.

47. *First*, the FTC's market definition is simply wrong. With respect to the geographic market, the FTC seeks to limit the scope of the TiO2 market only to North America, even though TiO2 is a globally traded commodity. The United States itself exports more than half of its TiO2 production and imports almost a third of its consumption. Pricing in the industry is based on global competition and pricing across different regions is highly correlated. The FTC's position is contrary to the evidence and wrong as a matter of economics. This failure to define a relevant geographic market shows the FTC has no likelihood of success on the merits.

48. With respect to the relevant product market, the FTC is seeking to distinguish two different processes for producing TiO2 that are reasonably interchangeable and that overwhelmingly comprise part of the same product market. TiO2 can be manufactured using either a "chloride process" or a "sulfate process." The FTC contends that the TiO2 generated from the two different manufacturing processes should be considered different products. Yet, TiO2 customers substitute sulfate and chloride TiO2 in the vast majority of applications. At least 80% of applications using TiO2 manufactured in the chloride process can also use TiO2 manufactured in the sulfate process. Accordingly, a small but significant and non-transitory increase in the price of TiO2 manufactured using the "chloride process" would cause TiO2 producers to shift their purchases to TiO2 made by the "sulfate process." Moreover, companies that sell TiO2 manufactured in the chloride process compete directly for sales with companies that manufacture TiO2 using the sulfate process. The FTC's failure to define a relevant product market also confirms that the FTC has no likelihood of success on the merits.

49.     When the market is properly defined as a global market for TiO2 (rather than a North American market for TiO2 produced using a chloride-based process), industry concentration according to the FTC's own metrics indicates that this proposed transaction raises no material issues with respect to competition.

50.     *Second*, separate and apart from the FTC's flawed market definition, the FTC has no valid basis for claiming Tronox's acquisition of Cristal will harm competition.  The TiO2 industry is highly competitive by any standard.   Since emerging from bankruptcy in 2011, Tronox (and its competitors) have experienced dozens of consecutive months of falling prices, significant inventory accumulations, and negative profit margins.   The actual financial results refute the FTC's allegations that market participants are coordinating to support prices or that the combined Tronox-Cristal entity would cut output to support prices.

51.     The FTC's claim that Tronox's acquisition of Cristal will substantially reduce competition is flawed because it rests on the counter-factual premise that Tronox will reduce output after the transaction closes.  In fact, the entire predicate of the transaction from Tronox's perspective is to expand output.  Indeed, Tronox's acquisition of Cristal would make no financial sense for Tronox if it were planning to reduce output.  Tronox has repeatedly declared in public and in contemporaneous, ordinary-course internal correspondence that enhancing production is the leading rationale for the transaction.  For that additional reason, the FTC cannot establish a likelihood of success on the merits as required under Section 13(b) of the FTC Act.

52.     The proposed acquisition is pro-competitive because it will expand output and make the parties' TiO2 plants more competitive in the world marketplace.  Among other things, Tronox has more TiO2 feedstock production than its TiO2 pigment plants can consume, while Cristal has more TiO2 production than feedstock production.  Combining the two companies'

assets will achieve synergies through vertical integration, which in economic terms will lead to lower costs, expanded output, and lower pricing. Cristal has facilities that are underperforming or not producing at all. One underperforming facility is a TiO2 pigment plant that uses licensed Tronox technology. Tronox, being a proven expert in its own technology, will be able to fix these underperforming and nonperforming assets, expanding output in both TiO2 feedstock and TiO2 production. The result again will be lower costs and pricing across the industry.

53.     Tronox will demonstrate that the FTC has no likelihood of success on the merits of its objections to the proposed transaction. Tronox will demonstrate that no injunction under Section 13(b) is warranted here, and the transaction should be allowed to close. So instead of attempting to prove its case on the merits to a federal court by seeking a preliminary injunction, the FTC is content to run out the clock with regulatory processes in order to deny Tronox its day in court. This is an abuse of the FTC's authority. It is contrary to the principles of predictability and transparency that the FTC and its Commissioners claim to have adopted. And the FTC's decision to run out the clock in this case rather than facing a ruling on the merits of the proposed transaction will cause irreparable harm to Tronox and to customers of TiO2 that will be denied the benefits of this pro-competitive proposed transaction.

## COUNT 1
## ADMINISTRATIVE PROCEDURE ACT: DECLARATORY JUDGMENT

54.     Tronox repeats and restates the allegations in paragraphs 1-53 of this complaint as though fully set forth herein.

55.     Based upon the FTC's commencement of a Part 3 Proceeding and its failure to file for a preliminary injunction in federal district court, Tronox has a substantial and immediate fear that the FTC is attempting to prevent its proposed acquisition of Cristal by "running out the

clock" and denying Tronox any meaningful opportunity to defend the transaction in court before the expiration of the purchase agreement on May 21, 2018.

56.     The Administrative Procedure Act requires an agency, "[w]ith due regard for the convenience and necessity of the parties … and within a reasonable time … [to] proceed to conclude a matter presented to it." 5 U.S.C. §555(b). The Administrative Procedure Act further recognizes that agencies have an obligation not to "unlawfully with[o]ld or unreasonably delay[ ]" agency action. 5 U.S.C. §706(1).

57.     The FTC has refused to act "within a reasonable period of time … to conclude a matter presented to it," by refusing to seek a preliminary injunction under Section 13(b) as a mechanism for preventing Tronox's proposed acquisition of Cristal without regard for the legality of the proposed transaction or its pro-competitive and output enhancing effects. The same refusal to act also amounts to unlawfully withholding agency action and unreasonably delaying agency action.

58.     Pursuant to 28 U.S.C. §§ 2201 and 2202, a declaratory judgment is necessary to confirm that the FTC has refused to act "within a reasonable period of time … to conclude a matter presented to it" in violation of 5 U.S.C. §555(b) and has unlawfully withheld and unreasonably delayed agency action in violation of 5 U.S.C. §706(1).

59.     As a result of the acts and omissions described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

60.     A judicial declaration is necessary and appropriate so that Tronox may avoid irreparable harm arising from the failure to close the transaction by May 21, 2018 without any meaningful opportunity to litigate the FTC's objections.

61.     For these reasons, Tronox asks this Court for a judicial declaration that the FTC unlawfully failed to act "within a reasonable period of time … to conclude a matter presented to it," in violation of 5 U.S.C. §555(b), and has unlawfully withheld and unreasonably delayed agency action, in violation of 5 U.S.C. §706(b).

## COUNT II
## ADMINISTRATIVE PROCEDURE ACT:  COMPEL AGENCY ACTION

62.     Tronox repeats and restates the allegations in paragraphs 1-53 of this complaint as though fully set forth herein.

63.     Based upon the FTC's commencement of a Part 3 Proceeding and its failure to file for a preliminary injunction in federal district court, Tronox has a substantial and immediate fear that the FTC is attempting to prevent its proposed acquisition of Cristal by "running out the clock" and denying Tronox any meaningful opportunity to defend the transaction in court before the expiration of the purchase agreement on May 21, 2018.

64.     The Administrative Procedure Act provides a cause of action to a party aggrieved by an administrative action or failure of an agency to act, requiring a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

65.     The FTC is unlawfully withholding agency action and unreasonably delaying agency action in refusing to seek a preliminary injunction under Section 13(b) as a mechanism for preventing Tronox's proposed acquisition of Cristal without regard for the legality of the proposed transaction or its pro-competitive and output-enhancing benefits.

66.     Tronox is aggrieved by the FTC's decision to unlawfully withhold agency action and unreasonably delay agency action because Tronox will suffer irreparable harm if it is prevented from completing its planned acquisition of Cristal before the purchase agreement

expires on May 21, 2018, without any meaningful opportunity to litigate the FTC's objections to the proposed transaction.

67.     In order to prevent the irreparable harm that will result from any failure to close the transaction by May 21, 2018 without any meaningful opportunity to litigate the FTC's objections, Tronox asks this Court to compel the FTC to seek any injunction under Section 13(b) preventing the transaction no later than 5:00 p.m. EST on February 15, 2018.  In the event the FTC declines to seek any injunction by that time, Tronox asks the Court to enjoin the FTC from seeking any injunctive relief to prevent the proposed acquisition from closing.

### COUNT III
### SECTION 13(b):  DECLARATORY JUDGMENT

68.     Tronox repeats and restates the allegations in paragraphs 1-53 of this complaint as though fully set forth herein.

69.     Based upon the FTC's commencement of a Part 3 Proceeding and its failure to file for a preliminary injunction in federal district court, Tronox has a substantial and immediate fear that the FTC is attempting to prevent its proposed acquisition of Cristal by "running out the clock" and denying Tronox any meaningful opportunity to defend the transaction in court before the expiration of the purchase agreement on May 21, 2018.

70.     Upon weighing the equities and considering the Commission's ultimate likelihood of success, a Section 13(b) action from the FTC would not be in the public interest and the FTC would not prevail in seeking a temporary restraining order or a preliminary injunction.

71.     Pursuant to 28 U.S.C. §§ 2201 and 2202, a declaratory judgment is necessary to confirm that the FTC cannot make a showing that it is able to obtain injunctive relief against the proposed transaction under Section 13(b) of the FTC Act.

72.     As a result of the acts and omissions described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

73.     A judicial declaration is necessary and appropriate so that Tronox may avoid irreparable harm arising from the failure to close the transaction by May 21, 2018 without any meaningful opportunity to litigate the FTC's objections.

74.     For these reasons, Tronox asks this Court for a judicial declaration that the FTC could not prevail in an injunctive proceeding under section 13(b) were it to bring such an action challenging Tronox's acquisition of Cristal, and accordingly, there is no legal impediment that could prevent Tronox and Cristal closing their proposed transaction.

### PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that judgment be entered in its favor and prays that the Court grant the following relief:

A.     A judicial declaration that the FTC has failed to act "within a reasonable period of time … to conclude a matter presented to it," in violation of 5 U.S.C. §555(b), and has unlawfully withheld and unreasonably delayed agency action, in violation of 5 U.S.C. §706(b).

B.     An order compelling the FTC to bring any request for injunctive relief under Section 13(b) before 5:00 p.m. EST on February 15, 2018 or, in the alternative, an injunction prohibiting the FTC from seeking any such injunctive relief at any later date and time.

C.     A judicial declaration that the FTC could not prevail in an injunctive proceeding under section 13(b) were it to bring such an action challenging Tronox's

acquisition of Cristal, and accordingly, there is no legal impediment that could prevent Tronox and Cristal closing their proposed transaction.

D.      Such other and further relief as this Court may deem just and proper.


DATED: January 23, 2018                    Respectfully Submitted,


                                           */s/ Paul V. Cassisa, Jr.*
                                           Paul V. Cassisa, Jr.
                                           BUTLER SNOW LLP
                                           1200 Jefferson Avenue, Suite 205
                                           Oxford, MS  38655
                                           P.O. Box 1138
                                           Oxford, MS  38655-1138
                                           Telephone:     (662) 513-8004 (Direct)
                                           Facsimile:     (662) 513-8001
                                           E-mail:  Paul.Cassisa@butlersnow.com


                                           *Attorney for Plaintiff,*
                                           *TRONOX LIMITED*

40233346.v1